Good morning. Faye Arfa on behalf of Ms. Henderson and her mother and father, Steve and Landa Henderson are present in court. May it please the court. The reason we're here is because the court issued the erroneous instruction which Judge Pragerson referred to as a stupid instruction. Well the instruction that was given in Ms. Henderson's case was even worse because in that case the instruction told the jury they could conclude that she committed murder because she possessed stolen property. The California court agreed. Everybody seemed to agree that it was error to issue the instruction. The question was, was it constitutional error? And in this case it was. It was clearly constitutional error. The court of appeal relied on what they considered substantial evidence to corroborate her guilt, which really there wasn't substantial evidence, particularly pre-crime. When we look at the way the events flowed, Ms. Henderson had nothing to do with the killing. It was DeLeon and McChane and JFK. The first contact shown by the court of appeal and the statement of facts was on November 1st of 2004 when DeLeon called Thomas Hawk's cell. And then the next day Ms. Henderson, a dutiful wife, met with a real estate broker and also a financial planner, which hardly shows that she knew that they were going to be committing a murder, that her husband and McChane were going to be committing a murder. It was McChane and DeLeon. They're the ones that bought the stun guns. McChane bought the handcuffs. Even the first time on November 6th, DeLeon and McChane met the Hawks on the boat. Ms. Henderson had nothing to do with that. She didn't bring her baby on the boat. She wasn't even there. There's no showing she even knew where he was. She was working at the time she had a baby. She was pregnant. She was working. So the only reason the crime got aborted on that day was because Skylar DeLeon, he didn't realize how big Mr. Hawk's was and how much muscle he had. That's why it was aborted. It wasn't aborted because they were nervous. The Hawks were thrilled to... When you evaluate the evidence, though, and I'm going to call you a little bit on this, because the prosecutor is going to give a really different story of that. So you're giving us the most sanitized in your argument of what the evidence is. But when you evaluate evidence after someone's been convicted, you get all inferences from that. And the inferences that come from it, I mean, the prosecutor, the way that they portrayed the case, and while it's not the way that you argue the case, I certainly understand that. But your client was convicted, and their portrayal is her behavior chronologically starting from her statement that she was about to receive a large amount of money to meet the Hawks' to the phone records to her post-crime actions, which included sorting through Hawks' property, attempting to access the bank account, calling Thomas Hawks' brother, and the prosecutor framed all of those in the context that Henderson was in dire financial needs and her knowledge that de León was capable of murder, because apparently this wasn't his first rodeo. Well, so, I mean, so when we evaluate the evidence, you have to really, you know, I mean, I think you're not, that's not probably the best use of your time to paint the most sanitized version of the facts, because we really have to deal with all inferences in favor of the verdict. And there is another way to look at the evidence, and that, but that's not how you do it in the trial. But after someone's convicted, then, you know, when we evaluate for substantial evidence, when we evaluate for prejudice, all of those things, we have to look at it in most favorable to the verdict. Okay, well. Am I wrong? You know, actually, I'm not sure, but I believe when it comes to an instructional error, I know looking for substantial evidence. Well, but if instructional error, if you're talking about arguing, if we're arguing prejudice or harmlessness, then it, the weight of the evidence, how strong a case it was is, and how strong a case it was has to be evaluated with all inferences to the verdict. Okay, even, even looking at whatever they say, okay. Okay, so she told someone they were about to come into money. All right. So her husband told her they're coming into money. How does that, how does that, even looking at it, even looking at it in the light most favorable to the prosecution, how does that prove that she aided and abetted or conspired to kill? She knew. Okay. She's his wife. So he told her, honey, I'm coming into money. Okay, but you don't get to just pick out each fact. You have to put all the facts together and say, what are the inferences from that? Okay, even looking at all the facts together, but we're, but still, they have to prove pre-crime knowledge. The post-crime knowledge goes to where the instruction really hurt. But when you look at pre-crime knowledge, okay, there was, there was really only, I, I, I still don't get how, how they link her to the murder. Didn't she work, didn't she work on that power of attorney? We don't even know who was working on the power of attorney. It was apparently from their hotel in Long Beach. She could have had people there. We, we just don't, even looking at that, even assuming he called her, we don't know that the conversations were about the, the, the power of attorney. And, and so how does that implicate her in a murder? Let's say, I mean, even looking at it as the light most favorite, maybe he called her and said, how do you fix this computer? The computer's stuck. I mean, even, we just don't know. We don't know. Okay. So let's talk about Ayala. Ayala, Ayala, don't we have to give that, give that determination deference under AEDPA, especially in determinations where, that there was no prejudice in light of the overwhelming evidence of her guilt? I mean, doesn't Ayala come into play here? Well, I don't, I don't believe that the prosecution had cited that case, the attorney general. Right, but Ayala just came down this last Supreme Court term. Are you familiar with it? I will be in a minute. Well, just what the court said, I understand. Okay. Even looking at it, first of all, the state court felt compelled to analyze it under harmless error. They felt compelled because of Prieto that used the harmless error standard and they, and based on equity, the, the California Court of Appeal relied on, on, on Prieto saying that we have to use the harmless error standard. And we're saying you don't, that this is constitutional error. And we're, and, and, and in our standard. But isn't even constitutional error subject to the prejudice analysis? There's very few errors that are per se no more happens. And there's no, tell me what your best case is if there's instructional error that that's the end of the inquiry. Well, I, I, I relied on my briefs. I relied on. It goes to the standard of review. It doesn't go to whether you have to do, just because you have, even if it were constitutional error, there's no case law that says that it's per se reversal from that. Okay. Even, even so, I understand. But I lost my train of thought. But even, even so, even so, we relied on that Brecht versus Abramson standard, which on a due process issue, we're claiming due process and the California court didn't look at it under a due process and constitutional error standard, which is why we're here. So under the, under that standard, was there a denial of due process? And we'd have to say yes. All of the things that the court mentioned, even, even assuming, even assuming that, that those looking at it at the light most favorable doesn't show that the prosecution, that there wasn't constitutional error, especially with regard to the pre-crime planning or review. The prosecution relied on two things. They relied on the fact that she met with her financial planner and a banker. And I think the thing that really doesn't come through is the fact that she was his wife. It's not, it's not, he's not talking to somebody else, he's talking to his wife. Well, I think they kind of argue she's the brains of the business. Well, you know, sometimes, sometimes the wives are smarter than the husbands. That's true, but no, this was, but this was McChain's thing. This was McChain's, I mean McChain and DeLeon's thing. She had nothing to do with it. These guys hung out together. They were together all the time. She did not tell them to go out and hand, get handcuffs. I could see if, if there was, and I'd like to save some time for rebuttal, if, if she had said to them, hey, go out and buy handcuffs, go out and do this, go out and do that. Well, but the way the prosecution portrayed it, they were the thugs. Yeah. I mean, and she didn't, she, but she was the brains. Don't get my hands dirty, but I'm the brains and she's the one that was, you know, the computer savvy person, all of those things, right? Well, I'm not sure that she was. And she's the one that took her child out there to kind of, you know, soften up the, the, the husband and wife that ultimately were killed. But that had nothing to do with evidence as to why they were killed. The reason that. But she was trying to make, what was it that one person, I think her husband appeared to be a legitimate buyer, right? He was, the reason it was aborted was not because of anything she did. He aborted it because he looked at the size of McJane, of the Hawks. That's why it was aborted. Are you saying her husband was a legitimate buyer? Oh, no, no, no, no. But, oh, when you, when you look at, when you look at, at, at the facts of the case, Hawks believed he was. There was never any hesitation on Hawks' part. And even when you look at their video, they're just thrilled to sell it. I don't think they're probably thrilled to be dead and thrown overboard. Oh, well. And their boat taken. So. But she had nothing to do with it. She happened to be married. She fell in love with the wrong man. She never. I get wives all the time that refuse to believe that their husbands are involved in any murders at all. I think that that that doesn't show that she knew or that she aided or bedded and wanted to aid and abet a murder. OK. And one more thing, as long as we're talking about this, I had all these uncertified issues. This is the second time I've been before this court. And we were supposed to get all 15 issues addressed in Henderson versus the first case that we. Because they weren't exhausted. So you were supposed to exhaust them. But that doesn't mean everything's entitled to be. No, you're asking us to consider them, which. Yeah, because when I went in front of the Ninth Circuit, the issues were exhausted and the Ninth Circuit made it clear when I was here. I argue this, that because all the issues were exhausted by the time it went back a second time, the court had to had to consider them. That was a Henderson versus I was here arguing. So I know what the court said. I know what I argued. And the court said all of the issues had to be considered. So I would ask the court mean that there has to be a COA issued or that we have to reconsider them on appeal. Well, it means they had to be considered back there. I think that's where the I think that's where. Well, they weren't they weren't considered. So that's why we're appealing to this court. Because this court specifically ordered as part of the opinion that they were supposed to consider all issues, all exhausted issues, not just the three that were originally there. So I would ask this court again to look at that uncertified issue and consider all the the all of the unexhausted, all of the all of all 18 issues that we raised. And there's significant amounts of things. There's there's abundant prosecutorial misconduct. I mean, they relate and consider. Were you trial counsel? Pardon me? Were you trial counsel? No, I wasn't. No. And that's probably why another reason he was he was convicted. We raised a lot of ineffective assistance. I mean, the prosecutor equated her to Hitler and Manson and Mengele and and and the standard of proof. So anyway, I would like some time for rebuttal. I that'll be up to Judge Pregerson. OK, thank you. Excuse me one moment, please. Good morning. May it please the court. I'm Kevin Vienna, a California deputy attorney general for respondent. A couple of preliminary matters I think perhaps are worth looking at. The first is Ms. Arfa's argument that the court the court, when this case was up here before on the question of exhaustion or abstention, that was the particular issue, send it back to the district court and said, here's the case. That is, you can't simply disregard everything based on abstention because she's exhausting 15 more issues. It did go back to the district court. The district court did consider those 15 issues and found each of them to be procedurally defaulted. Ms. Arfa seems to misunderstand what consideration of the case means. That is, she thinks that she was entitled to a decision on the merits. Well, I suppose you could say that a procedural default is close to that for federal purposes. But she was entitled to have the district court consider all of her exhausted claims. And the district court clearly did. It's just each of those 15 claims was procedurally defaulted as untimely. And that followed shortly after the Supreme Court's decision in Walker v. Martin, which held that California's timeliness default is adequate to bar federal review. And they simply imposed that default. The second question I think that I'd like to address, if I may, is your question, Your Honor, about Davis v. Ayala. Yeah. Does that affect our analysis here regarding the state court's determination that Henderson was not prejudiced by the use of ‑‑ it's a slightly different ‑‑ it's the same instruction. Yes, Your Honor. But it's 376, I guess. I would love to say that it does. And I struggled with this a bit last week, but I don't think I can. Davis v. Ayala was important. Well, I was involved in several of the cases that led to the decision that was reversed in Davis, including Merrill Leo, where this court had said earlier that there was no deference due to a state court's Chapman determination of harmless error. And that was reversed in Davis v. Ayala in June. But the reason I didn't file a 28J letter, and the reason I don't think I can argue that Davis changes the analysis of this case, is because the state court clearly did not make a Chapman determination. Now, I think they could have, and I think they would have, because as they described, the evidence against Ms. Henderson was overwhelming in the view of the state court or substantial in the view of the district court. I think they would have and should have reached a harmless beyond reasonable doubt determination based on those statements. But I don't think I can argue that there was a Chapman decision in the state court that's entitled to deference pursuant to Davis v. Ayala. So we have to make that determination here? Would you have? Well, I think you don't have to make that determination because I think under the forgiving standard of the AEDPA, the state court reasonably decided there was no constitutional error with this defective and, in this case, stupid instruction that was given. But in the context of this case, it didn't matter. And so as the district court explained, if the court were to proceed to harmless error, that standard for this court, the Breck standard is essentially the same as the standard applied by the state court, the Watson standard, and you should reach the same conclusion if you got to harmless error because this instruction didn't matter much in the context of this case. Counsel spent a lot of time on talking about the facts in the case. And we were sort of going, what are the facts, if we have to weigh into, you know, prejudice, from your perspective, what are the facts that we have, the ones that matter in terms of the substantial evidence or to evaluate prejudice, considering the standard that she was convicted and that you're entitled to all evidence, all inferences? Well, yes, Your Honor. And I thought you summarized many of the ones. Well, the state court decision makes those clear and the district court makes those clear. The prosecutor argued to the jury in this case, made it quite clear to them that the question was for them with regard to Ms. Henderson, the question was, did she know what was happening before the Hawkses were murdered? Did she know? Now, there's a bunch of context that suggests that she's not just a dutiful wife, that is she had covered up for her husband's earlier murder of Mr. Jarvie a year before. So she's a wife who knows that her husband. So was that evidence before the trial? Yes, it was, Your Honor. And she was, neither of them was ever prosecuted for that murder. It took place in Mexico. The prosecutor made a statement that it wasn't well investigated. But it was in that case there was little evidence showing that Ms. Hernandez knew that De Leon was going to kill Mr. Jarvie in Mexico. But there was plenty of evidence that she knew shortly afterwards, within a couple of hours, that he had killed in Mexico and she assisted him in avoiding criminal responsibility for that action. Several months later, they are dead, badly broke, deeply indebted, no income, no job prospects. And the timing here, I think, of these next couple of facts is particularly important. And the jury heard all this. Yes, Your Honor, did hear that. On November 1st, De Leon calls Mr. Hawks. And there's an eight-minute conversation. Now, we don't know what that conversation was about necessarily. But what we do know is that at that time, the Hawks has wanted to sell their 55-foot yacht, the well-deserved, for a price of $400,000. Now, and I particularly want to mention 55 feet because that plays an important part, or that strongly affects the way the court should view the next fact. And the description of the well-deserved is in the reporter's transcript at page 448 to 449. The next day, November 2nd, 2003, De Leon and Ms. Henderson go to visit a realtor. And they tell that realtor that they want a very expensive waterfront home at which they can dock a 55-foot yacht. And then shortly after that, De Leon and Ms. Hernandez go to their financial planners and say that they're about to get a gift of a lot of money. And essentially, they want to make sure that they handle that transaction, that gift from his family. That is, these people who've been destitute for a year are expecting to get a huge gift of some sort from his family. It is, I think, any jury would see it as nonsensical. So that, we think, is a clear indication that she was fully aware of the plan to steal the 55-foot yacht from the Hawks. And she was aware of that by November 2nd. The murders don't take place until about two weeks transpire. On November 6th... Talking to financial planners and real estate agents, it's kind of hard to fathom why people would go around and talk that way. The whole thing is strange. It's very strange. As I explain to my friends who don't deal with this as often, we don't convict many criminal geniuses. And these two were not criminal geniuses. They had a bit of a plan. In fact, maybe more than some plan. That is, they planned not just to steal the yacht, but also they had arranged to obtain documentation that they thought would help them to register the boat, transfer it, and give them access to all of the Hawks' financial wherewithal with a durable power of attorney. That they forced the Hawks to sign and fingerprint and that they... Who was the genius that drafted this jury instruction? Well, it is a standard jury instruction that has been used in California for quite a while. As my colleague, Mr. Mulford, said in the last case, it was essentially required in these cases because, for some reason, the courts and the defense bar thought it was helpful to the defense. I believe that's the case. People v. Barker. It's cited in... It preceded Prieto. People v. Barker. It's cited in both of our briefs. But in Prieto... And I would add that I agree completely with your statement before that this instruction does nothing. It tells people that possession of recently stolen property raises an inference that the person in possession of it was involved in the crime or the property. No, it's guilty of murder. Well... That's what it says. Well, it says... If you find that the defendant was in possession of recently stolen property, the fact that possession... The fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of murder. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt. So they're telling the jury that possession creates an inference that the defendant is guilty of the crime of murder, but you need a little more than that. You need some corroborating evidence and that need only be slight and need not by itself be sufficient to warrant an inference. And in the very next sentence... Yes, and that's defective and the state court has said that's defective. In the very next sentence, they say, don't forget the standard of proof to convict anyone is proof beyond a reasonable doubt. So what they... I would say that the instruction should not have been given and we agree with that, but it wasn't... It is not an error of constitutional dimension because the inference is not irrational. That is, possession of stolen property creates an inference, a permissible inference, that someone was involved in the crime where that property was unlawfully obtained. And that inference would carry over in a case like this, where... I mean, that inference matters mostly in the circumstance where someone's house is broken into and no one is caught in the house, but 15 minutes later someone is found walking down the street with a bag full of property that comes from the house. It helps to show who the identity... I mean, I think that's the useful inference. That's when it might matter. That's the useful inference. But in this case, we have a number of things that are a good deal different. First, we don't have recent possession of property. That is, the property from the Hawks' home was found a month later in a search of the De Leon and Henderson's property. Doesn't that make the inference even less reasonable? Yes. And that's why it would have been harmless. That's why it didn't matter in this case. This wasn't a whodunit. The connection between possession a month later and the murder is very slight, and the jury was reminded here that they must find guilt to have been proved beyond a reasonable doubt. They also were instructed, as is typically the case, on how to deal with what this is, which is circumstantial evidence, that if circumstantial evidence points to guilt, then that may be a basis for conviction. But if circumstantial evidence points either to guilt or to innocence, then the jury must find the person to be innocent. I had really, I think... Well, Judge Callahan, I'm not sure that I got as far as I might have gone about the evidence. The other evidence pre-crime were the things that you mentioned. That is, after De Leon and Machein met with the Hawkses and realized they weren't going to be able to carry out their plan that day, De Leon was worried that he wouldn't get back on board that yacht. And to deal with that worry, he called his wife and said, you need to come with me and meet with the Hawkses, and the words are, put their minds at ease. That's at Record of Trial, page 473 to 474. Put their minds at ease. The circumstantial evidence showed that she went later that afternoon. Did she take a child? And she took a child, and she was pregnant. And she did, in fact, put them at ease. And we know that because Jackie Hawks, when she was being subdued just shortly before their murder, she said, Skylar, why are you doing this? We trusted you. You brought your wife and kids. That's at 3RT 489 to 490. So his scheme was successful. What else shows her involvement before the crime? Well, there is, I think, a strong inference that she was working together with De Leon in adjusting the sale documents. The phone conversation occurs just as someone in their hotel room is using their computer to make the document that he uses just a few days later. I think the inference is unavoidable. It's him, and he's on the phone with her while that's going on. How do you know that? I don't know. I have no direct evidence. I think the inference from that circumstantial evidence is unavoidable, Your Honor. And then finally, on the day of the murder, there are 15 telephone calls between De Leon and Ms. Henderson when their daily average in their normal engagement as husband and wife has been four. So I mean, I suppose it's conceivable in the way it's conceivable that there's life on Mars, that they were discussing household chores and child care. There is life on Mars. Some people think that that movie, The Martian, is history. So some folks strongly believe that there at least was human life on Mars at one point. But be that as it may, the evidence of her involvement up to the crime is there. The crowning evidence is her helping to put the Hawks at ease. And then after they're killed, she behaves just as someone who was involved in this from the beginning would have. I mean, this dutiful, loving wife is not surprised. She shows no surprise. In fact, is eager to help her husband and happy that they have come into possession of the Hawks' boat and hope to get to their bank accounts and real estate in Arizona. But the final point I would make, if the court will give me just one moment, is this. This is an AEDPA case. The state court found, I think implicitly, as I argued implicitly, that there was no constitutional error. I think that's explicit now since the California Supreme Court explained in Moore that this is state law error only. It is not constitutional error under the standard of Francis versus Franklin. That is, I think, the applicable Supreme Court precedent. So we have a decision on the merits, an explanation of why the court thinks that that was not constitutional error, and then the standard from Francis says that there are circumstances when a permissive inference might create a constitutional error. And it says that happens. Let's just assume that you're in overtime, but just for purposes, if the court were to go there, I heard counsel for the appellant arguing that if it were a constitutional violation, and I'm sort of questioner on that, that it's per se and it's end of inquiry. What's your understanding at that point? This is not structural error, Your Honor. This is not structural error. It is trial error that's subject, if the state court has not made a Chapman determination, it is subject in this court to the harmless error standard of Brecht. Okay. But it does touch upon the constitutional error of due process. Yes, it does, Your Honor, but Yes, it does. And in Francis, the court goes on after it describes that when that might happen, that is an irrational inference. It says, and if that happens, we have to look at everything else that's happened in all the other language. And in this case, the other circumstances are this instruction didn't matter, and the other circumstances are that the jury was reminded in the very instruction that all that it could do is draw an inference and it still had to find guilt beyond a reasonable doubt. Thank you for your indulgence. Constitutional error, federal constitutional error, the harmless error analysis doesn't obtain. The Brecht harmless error analysis would obtain. Yes, Your Honor. It's much more stringent. Well, it says you have to decide that there was a substantial and injurious effect on the jury. And as the district court explained, and I think is implicit in the state court's determination, that's not there. But I am over time, and thank you for your indulgence, Your Honor. Can I respond? Otherwise, it will bother me. Yeah, go ahead. Thank you. Number one, I just wanted to point out that in the previous opinion, if you look on page six, the parties have agreed that the California courts considered and rejected all of Henderson's habeas claims. Her federal petition contains only exhausted complaints and should be allowed to proceed. This court made that determination. The district court found them unexhausted when this court specifically said the claims had been exhausted. Are you addressing something? Oh, yes. Are you addressing a matter that counseled for the state? Yeah, he brought that up first, so I just wanted to clear that. But I want to say, number one, the prosecution is saying that she was destitute. She was not destitute. She was a working mother. She was a hairdresser. Her parents were helping them. They didn't have any rent to pay. She was living with the parents. So to say that they were destitute isn't true. They had a roof over their head. They had meals. They were living with their parents. Where were they living? They were living, apparently, they had a separate housing unit in the back of their parents' house. It was a garage. Well, it was a converted garage. It was a converted garage, yeah. Yeah, but still, they had a place to live. They'd been living there for years. Yeah. So it's not like, you know, they... Well, could you dock a 55-foot yacht there? Oh, definitely not. Okay. Okay. I think that's the other side of it. Well, the issue... Listen, if we start talking about DeLeon, I mean, this guy had a... He didn't do this for her. He did this because he wanted to have a sex change operation, and that was scheduled for November 30th of 2014. It was done for that reason. That's why he wanted the money. I mean, he was telling her all these lies, just like he was telling everybody else lies. DeLeon was getting the sex change. Yes. It's in the opinion, and it was scheduled for November 30th of 2004, which would have been two weeks after he got the boat and the money. So he was not thinking of Jennifer at this time, Ms. Henderson. Secondly, the statements about at ease, okay, that at ease, that came out of the mouth of McChain. McChain, the actual hands-on killer. He's the one that said DeLeon called Henderson, which we don't really even know who he was talking to, said make it look real or we need to put him at ease or something. That came out of his mouth and at trial. And another thing that came out of his mouth was when he told... when he said, oh, Jackie, Jackie said that, oh, you brought your wife and your child on here and we trusted you. That was out of McChain's mouth. McChain, who ended up with 20 years after throwing two people off a boat and handcuffing them and handcuffing that crying Jackie. He was trying to save his own self, and that's another thing that I brought up. All of the stuff, most of the main stuff that came out about Henderson, that call and why she brought the baby on board came from McChain. Okay, he was granted immunity, but he was also getting a deal. And he's the hands-on killer and he had every reason to lie. And in terms of the instruction, this instruction was even worse than the one they gave. This was instruction 370, which required... not that they could infer, but they could conclude. So in terms of constitutional error, the instruction undermined the prosecution's burden of proof beyond a reasonable doubt. That's... You're saying what I just read here was not the instruction given? The instruction given... I saw it a little different. I don't know what the Court's reading from. Well, I'm reading from my typing. Oh, because the instruction given here, and I made it clear in my reply brief, was that they could conclude. It's instruction 376, because they modified the 215 instruction, and now they say you can conclude. So all of the evidence that we see, the instruction undermined the burden of proof beyond a reasonable doubt. I looked at the David D. Ayala case, and that has to do with the preemptory challenges of juries, not sufficiency of the evidence. No, I know that's what the case was about, but really what's significant to hear is under AEDPA, what sort of deference you have to show to a state court finding of harmlessness. Okay, well... So that's not really... But they also cite Brett v. Abramson in that case, too, which talks about due process violations. So in this case, I mean, I agree also with Judge Pragerson's comment. I mean, if she had anything to do with the murder, why is she going to go to a financial planner and a realtor and tell them about this? I mean, that actually goes to her innocence, because she didn't know. So she wanted to be above board about this. So we would respectfully ask the court to reverse this case. Just another comment, since I'm all worked up. But another thing is that the prosecution wanted her because they offered her immunity, and she turned it down. Okay, so they really wanted her. They were grasping at straws to try to show that she had something to do with this killing, when she really didn't. I mean, if you look at it, if you look at everything that happened, it was with Jane and DeLeon, and then he's the one that went out and got that gang member, the muscle that he brought on and called an accountant. She had nothing to do with this. Well, the Patsy Cline song, Stand By Your Man, is coming to mind here. Obviously, a prosecutor would rather give immunity to the person, not the person that did the actual act. But that doesn't mean that other people, you know. Oh, everybody. But so Machaine was willing to talk, and she wasn't willing to talk. So what do they say? The first to squeal gets the deal. And, you know, we can't revisit that part of it. So I think, you know, I think you're arguing, like, to the jury. We're not the jury. We're the appellate court. Yes, but even so, in terms of who's getting what, I still think that the court has to look at the entire case. When you look at the notary, everybody else, they were all given immunity. Okay, they all wanted part of the money. So to say that because she took her baby to the boat, that she had something to do with the killing is, to us, far-fetched. Even looking at it in the light most favorable to the prosecution, even assuming she did all this stuff, there's nothing to show that she had anything to do with the killing. And there is that standby, your man, and I think that she did. She honestly believed in a marriage, and she believed in having children, and that's what she wanted. And, in fact, he's the one that wanted a sex change operation. Okay, now, I think that's very telling as to what De Leon was all about. He was not truthful to his wife in a lot of the stuff. Okay, many thanks. I appreciate all the time and the court's attention. I just want you to feel better when you leave. Do you really want me to make me feel better? No, no, no, no. That's a... We'll follow the law. Thank you. Thank you very much. Thank you for your time. Sure.
judges: Bastian, Pregerson, Callahan